## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF TEXAS
## DALLAS DIVISION

| | | |
|---|---|---|
| CERTAIN UNDERWRITERS<br>AT LLOYD'S OF LONDON AND<br>ARCH SPECIALTY INSURANCE CO., | § § § § | |
| Plaintiffs, | § § § | CIVIL ACTION NO. _____ |
| v. | § § | |
| RALPH S. JANVEY,<br>IN HIS CAPACITY AS<br>COURT APPOINTED RECEIVER FOR<br>STANFORD INTERNATIONAL<br>BANK, LTD., ET. AL. | § § § § § § | |
| Defendant. | § § § § | |

## PLAINTIFFS' ORIGINAL COMPLAINT FOR DECLARATORY JUDGMENT

Plaintiffs, Certain Underwriters at Lloyd's of London and Arch Specialty Insurance Co.

(collectively "Underwriters"),[1] file this Original Complaint for Declaratory Judgment against

Ralph S. Janvey ("Receiver"), in his capacity as court-appointed receiver for Stanford

International Bank, Ltd., Stanford Group Company, Stanford Capital Management, LLC,

Stanford Financial Group, Stanford Financial Group Bldg. Inc., and any other entities controlled

by Robert Allen Stanford, James M. Davis, and Laura Pendergest-Holt (collectively, the

"Stanford Entities"), and would show:

---

[1] Underwriters include Lloyd's of London Underwriting Members in Syndicates 2987, 2488, 1886, 2623, 1084, 4000, 1083, 1274 and 623, and Arch Specialty Insurance Company.

# I.    INTRODUCTION

1.      Underwriters seek a declaration that Defendant Ralph S. Janvey, Receiver for the Stanford Entities, is not entitled to coverage under the policies that are the subject of this lawsuit because his claims result from a course of fraudulent conduct perpetrated by the Stanford Entities, as alleged by the Department of Justice ("DOJ"), the Securities and Exchange Commission ("SEC"), numerous aggrieved investors—and even by the Receiver himself.

2.      Although Underwriters issued certain insurance policies to Stanford Financial Group Company, Stanford Group Company and their affiliated entities[2] under which they agreed to indemnify certain Stanford entities against losses related to claims made during the policy periods, the policies all specifically exclude coverage where a claim results from the Stanford Entities' dishonest, fraudulent, or criminal acts or omissions.  The DOJ and SEC allege that the Stanford Entities perpetrated an elaborate ponzi scheme that cost innocent investors billions of dollars.  The Receiver does not deny those allegations—in fact, the Receiver has repeatedly made identical allegations in this Court, going so far as to describe the Stanford Entities as a "fraud machine" powered by sales of worthless CD's.

3.      The losses against which the Receiver seeks indemnification resulted from fraud, and thus are excluded from coverage.  Because the Receiver himself has alleged that his claims resulted from fraud by the Stanford Entities, he is judicially estopped from denying that his claims are excluded from coverage.  Underwriters therefore file this action seeking a declaration that the Receiver's claims are excluded from coverage.

---

[2] These policies include the Directors and Officers' Liability and Company Indemnity Policy No. 576/MNK558900 (the "D&O Policy"), the Financial Institutions Crime and Professional Indemnity Policy No. 576/MNA851300 (the "PI Policy") and the Excess Blended "Wrap" Policy No. 576/MNA831400 (the "Excess Policy") (collectively "the Policies").  True and correct copies of the Policies are attached as Exhibits A-C.

## II.   PARTIES

4.      Underwriters subscribing to the D&O Policy for the policy period August 15, 2008 to August 15, 2009.  Underwriters are insurers authorized to do business in the State of Texas.

5.      Underwriters subscribing to the PI Policy for the policy period August 15, 2008 to August 15, 2009.  Underwriters are insurers authorized to do business in the State of Texas.

6.      Underwriters subscribing to the Excess Policy for the policy period August 15, 2008 to August 15, 2009.  Underwriters are insurers authorized to do business in the State of Texas.

7.      Defendant Ralph S. Janvey, Receiver, is the court-appointed receiver for the Stanford Entities.  The Receiver's principal place of business for making decisions in respect of operating and disposing of each of the Stanford Entities and their respective assets is the Northern District of Texas.  The Receiver may be personally served with process at Krage & Janvey, LLP, 2100 Ross Avenue Suite 2600, Dallas, TX 75201.

## III.   JURISDICTION AND VENUE

8.      This Court has jurisdiction over this lawsuit pursuant to 28 U.S.C §§ 1331, 1367, 2201 and 2202.  This Court has assumed exclusive jurisdiction over the assets, monies, securities, properties of any kind and the legally recognized privileges of the Stanford Entities and appointed a Receiver over those entities.  Order Appointing Receiver ¶ 1 [Docket No. 10.][3] This Court further has jurisdiction over this matter because it has restrained and enjoined any judicial proceedings against the Receiver unless the proceeding is brought in this Court.  *Id.* ¶ 9.

---

[3] Citations to documents identified by docket number refer to pleadings and orders on file in *SEC v. Stanford Int'l. Bank*, Cause No. 3:09-CV-0298-N (N.D. Tex. Feb. 17, 2009) (hereinafter "*SEC v. SIB*").

9.      Venue is proper in this judicial district and division under 28 U.S.C. § 1391(b)(1) because the Receiver resides in this district. *Id.* ¶ 7 ("the Northern District of Texas shall be the Receiver's principal place of business"). Venue is also proper in this judicial district and division under 28 U.S.C. § 1391(b)(2) because a substantial part of the alleged events or omissions giving rise to the claims occurred in this judicial district and division.

## IV.     FACTUAL BACKGROUND

### A.     The SEC Complaint and Order Appointing Receiver.

10.     On February 17, 2009, the Securities and Exchange Commission ("SEC") commenced an action against R. Allen Stanford, James Davis, Laura Pendergest-Holt, and various Stanford entities (collectively, the "Stanford Defendants") alleging violations of securities laws relating to an alleged fraudulent scheme. The SEC alleges Stanford, Davis and Pendergest-Holt, and companies they owned or controlled, including Stanford International Bank, Ltd. ("SIB"), Stanford Group Company ("SGC"), and Stanford Capital Management ("SCM"), perpetrated a multi-billion dollar Ponzi scheme in connection with the sale of SIB's self-styled "Certificates of Deposit" ("CDs"). First Amended Complaint ¶¶ 1-2, *SEC v. SIB* [Docket No. 48].

11.     The SEC alleged that by the end of 2008 SIB had sold approximately $8 billion worth of CDs by touting (1) the bank's safety and security; (2) consistent double digit returns on the bank's investment portfolio; and (3) high return rates on the CDs that greatly exceeded those offered by commercial banks in the United States. *Id.* ¶ 3. Unbeknownst to investors, however, the Stanford Defendants had misappropriated at least $1.6 billion of investor money through bogus personal loans to Allen Stanford and had "invested" an undetermined amount of investor funds in speculative, unprofitable private businesses controlled by Stanford. *Id.* ¶ 4.

12.    To conceal the fraud, Stanford and Davis purportedly decided on a pre-determined return on investment for SIB's portfolio each month and instructed SIB's internal accountants to "reverse-engineer" financial statements. *Id.* ¶ 5. These financial statements allegedly bore no relationship to the actual performance of the bank's investment portfolio. *Id.*

13.    The Stanford Defendants also purportedly sold more than $1 billion through a proprietary mutual fund wrap program, Stanford Allocation Strategy ("SAS"), using materially false and misleading historical performance data. *Id.* ¶ 6. The fraudulent SAS performance results were allegedly used to recruit new financial advisers who were heavily incentivized to reallocate their clients' assets to SIB's CD program. *Id.*

14.    Based on these pleadings, the United States District Court for the Northern District of Texas ("Northern District") found good cause to believe that the Stanford Defendants had committed a massive fraud and violated numerous securities laws.  On February 17, 2009, the Court entered a Temporary Restraining Order, Order Freezing Assets, Order Requiring an Accounting, Order Requiring Preservation of Documents and Order Authorizing Expedited Discovery.  Temporary Restraining Order ¶¶ 1-12, *SEC v. SIB* [Docket No. 8].

15.    On February 17, 2009, the Court also entered an Order Appointing Receiver, Ralph S. Janvey, over the Stanford Entities.  Order Appointing Receiver ¶¶ 1-2, *SEC v. SIB* [Docket No. 10].[4]  The Receiver was ordered to locate and take control of the Receivership Estate,[5] and, more broadly, to "perform all acts necessary to conserve, hold, manage, and preserve the value of the Receivership Estate, in order to prevent any irreparable loss, damage,

---

[4] The Court amended its Order on March 12, 2009, but the relevant provisions relating to the Receiver's duties and authority remain unchanged.

[5] The Receivership Estate consists of the assets, monies, securities properties of whatever kind and wherever located (the "Receivership Assets") and the books, account statements, computer servers and other informational sources of all entities owned or controlled by the Stanford Defendants, or in the possession of their agents and employees (the "Receivership Records").

and injury to the Estate." *Id.* ¶ 5. The Court's Order also gave the Receiver the authority to

"institute actions or proceedings to impose a constructive trust, obtain possession, and/or recover

judgment with respect to persons or entities who received assets or records traceable to the

Receivership Estate." *Id.*

**B.      The Receiver Alleges the Stanford Entities Perpetrated a Fraud.**

16.      Consistent with the Court's Order, the Receiver initiated several proceedings

against various individuals seeking to obtain possession of assets purportedly traceable to the

Stanford Defendants' fraudulent conduct.  Significantly, in pleadings and motions in each of

these proceedings, the Receiver has alleged that the Stanford Defendants—including the

Stanford Entities in whose shoes the Receiver now stands—perpetrated the fraudulent scheme

alleged by the SEC.  In fact, as more fully detailed below, the Stanford Defendant's alleged fraud

is the predicate for each of these lawsuits.

**The "Relief Defendant" Complaint**

17.      On April 15, 2009, the Receiver sued 66 former Stanford financial advisors (the

"Relief Defendants") to recover over $40 million allegedly paid to the financial advisors in

connection with the fraudulent scheme.  Receiver's Complaint Naming Stanford Financial Group

Advisors as Relief Defendants ¶ 1, *Ralph S. Janvey in His Capacity as Court-Appointed Receiver*

*for the Stanford Int'l. Bank, Ltd. et al. v. James R. Alguiere et al.*, 3:09-cv-0724-N (N.D. Tex.

Apr. 20, 2009) (hereinafter "*Relief Defendant Suit*") [Docket No. 2].  In addition to incorporating

the SEC's allegations, the Receiver's Complaint alleges that the Stanford Defendants "marketed

*fraudulent* CDs to investors in the United States exclusively through SGC financial advisers such

as Relief Defendants." *Id.* ¶ 74 (emphasis added).  The Receiver's position is that the

commissions, loans and other compensation paid to the Relief Defendants came not from

revenue generated by legitimate business activities, but from funds deposited by defrauded

investors. *Id.* ¶ 85. The Receiver alleges the Relief Defendants possess assets for which they have no legitimate ownership interest and which are traceable to the Stanford Defendants' fraudulent scheme. *Id.*

## The "Clawback" Complaint

18.     On July 28, 2009 the Receiver filed an amended complaint naming, as Relief Defendants, innocent investors who received principal and/or interest payments just before the Northern District appointed the Receiver.  Innocent investors were outraged at the Receiver's action and the SEC stepped in on their behalf.  The Receiver adamantly defended his decision to pursue innocent investors' funds because, he claimed, the Ponzi scheme tainted *all* SIB funds, including investor "principal."  These monies, the Receiver argued, were simply taken "out of one investor's pocket and [put] into the hand of another investor."  Receiver's Amended Compl. Naming Relief Defendants ¶ 3, *Relief Defendant Suit* [Docket No. 14].

19.     To preserve these assets, the Receiver also asked the Court to freeze those investors' accounts.  The Receiver justified this course by stating:

> The Receiver's investigation has confirmed that **the Stanford defendants were operating a fraud machine, the engine of which was revenue generated by sales of Stanford International Bank, Ltd. ("SIB") CDs.** The revenue, let alone any profit, from the numerous, diverse, complicated, and sometimes equally fraudulent, transactions in which the Stanford defendants engaged was miniscule. The lifeblood of the entire worldwide operation was SIB CD sales.[6]

20.     The Receiver further stated, "extensive forensic accounting work indicates that the Defendants operated a Ponzi scheme," and that "each of the Relief Defendants received funds that can be traced to proceeds from the sale of the fraudulent CDs." *Id.* at 7, 9.

---

[6] Receiver's Motion for Order Freezing and For Disgorging of Assets Held in the Names of Certain Relief Defendants, at 1, *Relief Defendant Suit* [Docket No. 17].

21.     The Court granted the Receiver's request to freeze monies attributable to purported interest payments, although it denied the Receiver's attempt to recoup investors' principal deposits. *See* Order Granting in Part and Denying in Part Motion for Order Freezing and for Disgorgement of Assets Held in the Names of Certain Relief Defendants, *Relief Defendant Suit* [Docket No. 35]. The Receiver recently filed an appeal of the Court's decision denying his attempt to recoup investors' principal deposits. *Ralph Janvey v. Jim Letsos, et al*, 3:09-cv-1329 (N.D. Tex. Jul. 15, 2009), *appeal docketed*, 09-10765 (5th Cir. Aug. 7, 2009).

### Other Attempts to Liquidate Stanford Assets

22.     Finally, the Receiver has initiated efforts to liquidate assets owned and controlled by Allen Stanford. The Receiver asserts the relevant assets were purchased with proceeds of the Stanford Defendants' fraud. For instance, on July 14, 2009, the Receiver brought a Motion for Order to Show Cause concerning Randi Stanford's interference with the Receiver's attempt to liquidate the condominium Allen Stanford purchased for her. The Receiver argued "the funds used by Allen Stanford to purchase the condo are traceable to his wrongful acts . . . the funds in Allen Stanford's personal bank accounts are traceable to fraud and are Estate assets." Mtn. for Order to Show Cause Why Randi Stanford Should Not Be Held in Contempt and Brief in Support at 7, *SEC v. SIB* [Docket No. 586].

### C.     The Receiver's Claim to Insurance Proceeds on Behalf of Stanford Entities.

23.     On June 24, 2009, the Receiver's counsel noticed claims on behalf of the Receiver under the Policies Underwriters issued to the Stanford Entities.[7] Specifically, the Receiver's counsel asserted a claim that the insurance proceeds are "Receivership Assets" as defined by the Order Appointing Receiver in *SEC v. SIB*. Furthermore, the Receiver's counsel asserted that the

---

[7] Receiver's counsel sent an email to Mendes & Mount, Underwriters' registered agent for notice of claims asserting his claim to the policy proceeds. A true and correct copy of this correspondence is attached as Exhibit D.

Receiver's right to contractual proceeds "supersedes" the right of other insureds. The Receiver's claim that the insurance proceeds are "Receivership Assets" is currently the subject of motions pending before the Court in *SEC v. SIB*.

24.     On February 12, March 19, August 12 and August 14, 2009, the Receiver submitted notices to Underwriters of dozens of claims (collectively, the "Noticed Claims") on behalf of the Stanford Entities under the Policies. Despite the Receiver's repeated allegations in this Court that the Stanford Entities perpetrated a fraud on investors, the Receiver now seeks to have Underwriters indemnify and/or pay the legal expenses that the Receiver incurs in "defending" the Stanford Entities in the various Claims that have arisen as a result of that fraud.

## V.     THE INSURANCE POLICIES

### A.     The D&O Policy.

25.     On August 25, 2008, Underwriters issued the D&O Policy to Stanford Financial Group Company, Stanford Group Company and various Stanford entities for the policy period August 15, 2008 to August 15, 2009. The D&O Policy pays, on behalf of the company, directors and officers, loss resulting from any claim first made during the policy period for a wrongful act. However, this insuring clause is subject to a number of coverage exclusions. Specifically, the Policy provides that the Underwriters shall not be liable to make any payment for loss resulting from any claim:

> I.     brought about or contributed to in fact by: (a) any dishonest, fraudulent or criminal act or omission by the Directors or Officers or the Company, or (b) any personal profit or advantage gained by any of the Directors and Officers or the Company to which they were not legally entitled . . . as determined by a final adjudication;
>
> . . . .
>
> L.     based upon, arising out of, directly or indirectly resulting from or in consequence of, or in any way relating to any act, error or omission in

connection with the performance of any professional services by or on behalf of the Company for the benefit of any other entity or person; or

. . . .

T.    arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) of Money Laundering or any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any money laundering legislation (or any provisions and/or rules or regulations made by any Regulatory Body or Authority thereunder).

This exclusion T further provides:

Notwithstanding the foregoing Exclusion, Underwriters shall pay Costs, Charges, and Expenses in the event of an alleged act or alleged acts until such time that it is determined that the alleged act or alleged acts did in fact occur. In such event the Directors and Officers and the Company will reimburse Underwriters for such Costs, Charges and Expenses paid on their behalf.

**B.**    **The PI Policy.**

26.    On July 25, 2008, Underwriters issued the PI Policy to Stanford Financial Group Company, Stanford Group Company, and various Stanford entities for the policy period August 15, 2008 to August 15, 2009. The PI Policy provides that Underwriters shall reimburse the assureds for loss resulting from any claim first made during the policy period for a wrongful act in the performance of a professional service. This insuring clause is subject to a number of coverage exclusions, however. Specifically, the PI Policy provides that the Underwriters shall not be liable to make any payment in connection with any Claim:

E.    brought about or contributed to in fact by any dishonest, fraudulent or criminal act or omission or any personal profit or advantage gained by any of the Directors, Officers and Employees to which they were not legally entitled, provided, however, no Wrongful Act shall be imputed to any other person for the purpose of determining the applicability of this Exclusion;

. . . .

K.    made against any of the Assureds by or at the behest of any federal or state governmental body or governmental agency, except when acting solely in

the capacity of a customer or client of the Company or on behalf of a customer or client of the Company;

. . . .

N.   where, and to the extent that, the Loss by reason of such Claim represents the return by the Assureds of excessive fees, commissions, costs or other charges;

. . . .

R.   for any Intentional Corporate or Business Policy

Corporate or Business Policy as used in this Exclusion shall mean any policy which has been approved, condoned, ratified or endorsed by two or more members of the Assureds' Management and which results in (a) a financial disadvantage to two or more of the Assured's clients, and (b) the Assured making a financial gain to which they were not entitled, whether or not such gain was returned.

The Assured's Management shall be deemed to be R. Allen Stanford, James Davis and James Stanford;

. . . .

S.   arising directly or indirectly as a result of or in connection with any act or acts (or alleged act or acts) which are in breach of and/or constitute an offence or offences under any Money Laundering legislation (or any provisions and/or rules or regulations made by any regulatory body or authority thereunder); or

. . . .

X.   (a) arising out of or in connection with any circumstances or occurrences which have been notified to the Insurer on any other insurance affected prior to the inception of this Policy

(b) arising out of or in connection with any circumstances or occurrences known to the Assured at inception of this Policy which could reasonably be expected to give rise to Loss of more than USD 100,000 under this Policy

Solely for the purposes of knowledge as required by point (b) above, the term "Assured" shall mean: the first named Assured's General Counsel or Corporate Risk manager.

## C.       The Excess Policy.

27.       On July 25, 2008, Underwriters issued the Excess Policy to Stanford Financial

Group Company, Stanford Group Company and various Stanford entities for the policy period

August 15, 2008 to August 15, 2009.  The Excess Policy provides that Underwriters shall

indemnify or reimburse or pay on behalf of the assured, any loss or losses first discovered and/or

any claim or claims first made against the assured during the period of insurance hereon up to the

Excess Policy's limit of liability, but in excess of the underlying policies' limits.  The Excess

Policy, however, is subject to several terms and conditions including, but not limited to the

following:

> 7.       Except as otherwise provided herein this Policy is subject to the same
> terms, exclusions, conditions and definitions as the Policy of the Primary
> Insurers.  No amendment to the Policy of the Primary Insurers during the
> period of this Policy in respect of which the Primary Insurers require an
> additional premium or a deductible shall be effective in extending the
> scope of this Policy until agreed in writing by the Underwriters.

## VI.      REQUEST FOR DECLARATORY RELIEF

28.       Underwriters incorporate paragraphs 1 though 27 by reference.

29.       The Declaratory Judgment Act expressly authorizes this Court to declare the

rights and other legal relations of any interested party seeking such declaration, whether or not

further relief is or could be sought.  28 U.S.C. § 2201.  Moreover, any such declaration shall

have the force and effect of a final judgment or decree and shall be reviewable as such. *Id.*

30.       Underwriters respectfully request that this Court issue three declarations to

terminate the uncertainty or controversy giving rise to this proceeding.

## COUNT ONE:  D&O POLICY

31.       An actual case or controversy exists between the parties as to whether, under the

circumstances set forth above, certain terms, conditions, and exclusions found in the D&O Policy

relieve Underwriters of their obligation to pay for any Loss resulting from any of the Stanford Entities' Noticed Claims, including but not limited to: Exclusion I, relating to dishonest, fraudulent, or criminal acts or omissions; Exclusion L, relating to the performance of professional services; or Exclusion T, relating to money laundering.

32.     Underwriters seek a declaration that certain exclusions to coverage, including but not limited to Exclusion I, Exclusion L, and Exclusion T operate to relieve their obligations to pay any amounts for Loss resulting from any of the Stanford Entities' Noticed Claims.

33.     Entry of a declaratory judgment is necessary and appropriate to avoid the risks and uncertainty arising out of the above-described controversy.

## COUNT TWO:  PI POLICY

34.     An actual case or controversy exists between the parties as to whether, under the circumstances set forth above, certain terms, conditions, and exclusions found in the PI Policy relieve Underwriters of their obligation to pay for any Loss resulting from any of the Stanford Entities' Noticed Claims, including but not limited to: Exclusion E, relating to dishonest, fraudulent, or criminal acts or omissions; Exclusion K, relating to government claims; Exclusion N, relating to the return of excessive fees; Exclusion R, relating to an intentional corporate or business policy;  Exclusion S, relating to money laundering; or Exclusion X, relating to prior knowledge of circumstances.

35.     Underwriters seek a declaration that certain exclusions to coverage, including but not limited to Exclusion E, Exclusion K, Exclusion N, Exclusion R, Exclusion S, and Exclusion X operate to relieve their obligations to pay any amounts for Loss resulting from any of the Stanford Entities' Noticed Claims.

36.     Entry of a declaratory judgment is necessary and appropriate to avoid the risks and uncertainty arising out of the above-described controversy.

## COUNT THREE: EXCESS POLICY

37.     An actual case or controversy exists between the parties as to whether, under the circumstances set forth above, certain terms, conditions and exclusions found in the primary policies relieve Underwriters of their obligations under the Excess Policy to pay for any Loss resulting from any of the Stanford Entities' Noticed Claims, including but not limited to: Exclusion I, Exclusion L, and Exclusion T in the D&O Policy; and Exclusion E, Exclusion K, Exclusion N, Exclusion R, Exclusion S, and Exclusion X in the PI Policy.

38.     Underwriters seek a declaration that certain exclusions to coverage found in the D&O Policy (including but not limited to Exclusion I, Exclusion L, and Exclusion T) and certain exclusions to coverage found in the PI Policy (including but not limited to Exclusion E, Exclusion K, Exclusion N, Exclusion R, Exclusion S, and Exclusion X) operate to relieve their obligations to pay any amounts under the Excess Policy for Loss resulting from any of the Stanford Entities' Noticed Claims.

39.     Entry of a declaratory judgment is necessary and appropriate to avoid the risks and uncertainty arising out of the above-described controversy.

## JURY DEMAND

40.     Underwriters hereby demand a jury trial.

## PRAYER

WHEREFORE, Underwriters respectfully request that the Court enter an Order including or directing the following relief:

(A)     For a declaratory judgment stating that one or more of the terms, conditions, or exclusions found in the D&O Policy relieve Underwriters from any obligations to pay any amounts for Loss under that Policy resulting from any of the Receiver's Noticed Claims on

behalf of the Stanford Entities, including but not limited to Exclusion I, Exclusion L, and Exclusion T.

(B)    For a declaratory judgment stating that one or more of the terms, conditions, or exclusions found in the PI Policy relieve Underwriters from any obligations to pay any amounts under that Policy for Loss resulting from any of the Receiver's Noticed Claims on behalf of the Stanford Entities, including but not limited to Exclusion E, Exclusion K, Exclusion N, Exclusion R, Exclusion S, and Exclusion X.

(C)    For a declaratory judgment stating that certain exclusions to coverage found in the D&O Policy (including but not limited to Exclusion I, Exclusion L, and Exclusion T) and certain exclusions to coverage found in the PI Policy (including but not limited to Exclusion E, Exclusion K, Exclusion N, Exclusion R, Exclusion S, and Exclusion X) relieve Underwriters of any obligations to pay any amounts under the Excess Policy for Loss resulting from any of the Stanford Entities' Noticed Claims.

(D)    For an award of Underwriters' fees and costs incurred in this action.

(E)    For such other relief the Court deems proper, just and equitable.

Respectfully submitted,

AKIN GUMP STRAUSS HAUER & FELD LLP

By:_____/s/ Barry A. Chasnoff_____
Barry A. Chasnoff (SBN 04153500)
bchasnoff@akingump.com
Daniel McNeel Lane, Jr. (SBN 00784441)
nlane@akingump.com
300 Convent Street, Suite 1600
San Antonio, Texas 78205
Phone: (210) 281-7000
Fax: (210) 224-2035

-and-

Eric Gambrell (SBN 00790735)
egambrell@akingump.com
1700 Pacific Avenue, Suite 4100
Dallas, Texas 75201
Phone: (214) 969-2800
Fax: (214) 969-4343

Attorneys for Certain Underwriters at
Lloyd's of London and Arch Specialty
Insurance